# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-25-00208-CV

---

### G. S., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 146TH DISTRICT COURT OF BELL COUNTY
### NO. 24DFAM344392, THE HONORABLE MIKE RUSSELL, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Following a bench trial, the district court terminated the parental rights of G.S. (Mother) to her son A.S. ("Alex"), who was approximately eleven months old at the time of trial.[1] In two issues on appeal, Mother asserts that (1) the evidence is insufficient to support the district court's findings that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of Alex and that termination of her parental rights was in the best interest of Alex and (2) because the evidence is insufficient to support termination of Mother's parental rights, the district court abused its discretion in appointing the Texas Department of Family and Protective Services (the Department) as Alex's managing conservator. We will affirm the termination decree.

---

[1] For the child's privacy, we refer to him using a pseudonym and to his parents by their familial relationships to each other. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

## BACKGROUND

The case began in February 2024, when the Department received a report alleging neglectful supervision of Alex by Mother. According to the Department's removal affidavit, a copy of which was admitted into evidence at trial, Mother gave birth to Alex at Baylor Scott and White Hospital on the morning of February 5, 2024. Shortly after delivering the baby, Mother "went outside to smoke a cigarette," appeared "lethargic" when she returned to her room, and "had a seizure and coded." The hospital stabilized Mother, gave her sedatives, and tested her for drugs. She tested positive for amphetamines. Mother consented to the hospital drug-testing of Alex, and he also tested positive for amphetamines and showed signs of withdrawal, specifically "not eating as much and shaking." Mother "admitted she used methamphetamine almost every day throughout her pregnancy," including the "Saturday or Sunday before giving birth," although she claimed to be "clean a total of 4 weeks in December 2023." Mother "stated she wanted to stop using but she was just being selfish."

Mother told the Department that she used methamphetamine with Alex's father, A.B. (Father), and that she had been living with Father until a week before giving birth to Alex. However, "she did not have plans to return to his home." Instead, "she was planning to move to Abilene with the baby after being released from the hospital but decided to stay in Harker Heights with a friend," who was "said to have used methamphetamine as well." The Department attempted to contact Father but was unable to do so.

Based on the above, the Department sought and obtained emergency removal of Alex and filed a petition for protection of the child and termination of Mother's and Father's parental rights. The district court ordered Mother and Father to complete various services to obtain Alex's return, including participating in individual therapy, completing a psychological

2

evaluation, completing a drug and alcohol assessment, maintaining a safe home, and submitting to weekly drug testing.

The case proceeded to a final hearing. The only witness to testify at the hearing was the Department's current conservatorship worker for the case, Rayonna Blas, who testified primarily regarding Mother's and Father's compliance with their service plans, copies of which were admitted into evidence. Regarding Mother's services, Blas testified that Mother did not complete a psychological evaluation and received individual therapy "with a private provider" because Mother "didn't want to go through any providers contracted through the Department, to include drug testing." However, the Department did not receive any records from this private provider, "only email correspondence where . . . [Mother's] therapist stated that she was unsuccessfully discharged due to not showing up and lack of participation." Blas confirmed through email that Mother had seen a therapist, but the therapist informed Blas that Mother "is no longer a client, because she wasn't actively attending."

In Blas's December 2024 final report to the court, a copy of which was admitted into evidence, Blas reported that Mother "was discharged from SA Counseling Center due to missing her appointments" and that although Mother was "participating in individual therapy with a private provider," she "has not signed a release of information," which was required by her service plan. The report further stated that Mother was initially referred to a Department-recommended psychologist, that Mother "did not complete her psychological evaluation" with that provider but wanted to complete it with a private provider, and that the Department had requested a release of information if the report was completed by any provider but that "[n]o report or information has been received at this time."

3

The final report indicated that Mother completed a drug-and-alcohol assessment in March 2024 and that the assessment recommended that Mother participate in a formal Residential Substance Abuse Treatment Program. The report further indicated that Mother had instead "accepted Outpatient treatment with the knowledge that she may return for a higher level of care if needed." However, "[i]n November 2024, [Mother] informed the Department that she has not completed outpatient rehabilitation." Blas confirmed in her testimony that Mother "didn't follow through with the outpatient recommendations." When asked why Mother had not attended outpatient treatment, Blas testified that Mother "was feeling hopeless, and not hopeful in the case. And she didn't want to work any services" provided by the Department.

The final report included the results of Mother's drug tests, most of which she did not take and thus were presumed positive. Mother did not submit to two requested tests in February 2024 and four requested tests in March 2024. Mother submitted to several requested tests in April 2024, testing negative on two urinalysis tests and positive for amphetamines on one hair-follicle test, two "send-off" tests, and two "instant" tests. Mother did not submit to two other requested tests in April, four requested tests in May, and four requested tests in June. Then, on June 27, 2024, Mother tested negative on both a "send-off" test and an "instant" test. However, Mother took no drug tests after that, missing four or five requested tests each month between July and November 2024.

Mother's failure to submit to drug testing adversely affected her continued contact with Alex, as her visits with him were dependent on Mother testing negative for drugs. Blas explained that before each visit, Mother was required to submit to an oral drug screen. The visit could proceed only if Mother tested negative. As a result, Mother's last visit with Alex was when she tested negative on June 27, 2024.

The final report indicated that the Department attempted to schedule virtual visits with Mother but that there were several visits where she "did not show up." During the visits that she did attend "there was minimal involvement," and Mother "would also go on and off camera during the visits." During a hearing in July 2024, the court ordered Mother to "complete a segmented hair test, three clean UA, and be participating in some of her services in order for visitation to continue." According to the report, Mother "has not completed any of the orders that were given to her during the [July] hearing."

Other information in the final report included that Mother's "current home environment is unknown to the Department," that Mother "allowed for a home visit in November 2024 where she stated that she does not permanently reside with [Father]," that she "is in between homes and is currently residing with [Father] temporarily and doesn't know for how long," and that she "reports that she is employed full time, however, she has not provided proof of income." The report concluded:

> [Mother] has not been fully participating in her services. [Mother] was discharged from therapy due to non-participation. [Mother] has not complied with her weekly drug testing and is not attending visitation with her son. There are still concerns that she is using methamphetamine as she has tested positive on multiple dates with the Department. [Mother] lacks a safe and stable residence as she is often moving in and out of the home with [Father] following disagreements. [Mother] has not shown behavioral changes to the safety and care of [Alex].

In response to questioning by the Department as to whether Mother was able to provide a safe and stable home for Alex, whether she had made the necessary behavioral changes to become a safe and appropriate parent for Alex, whether Mother had successfully completed any of her services, and whether there was anything further that the Department could have done to help Mother be more successful in the completion of her services, Blas answered, "No."

5

When asked why the Department was seeking termination of Mother's parental rights based on Mother's failure to comply with the court-ordered services, Blas testified, "Because the Department still has concerns that [Mother] is still continuing to use methamphetamines, because she is not drug testing and has hasn't drug tested since April. And when she did drug test, they were positive for amphetamines."[2]

When asked why she believed that termination of Mother's parental rights was in Alex's best interest, Blas testified,

> [Alex] has been with his caregiver since he was pretty much born—since he was a newborn. He is 11 months old, and he's known nothing but love from this family. He's permanently attached to his foster parents, to his brothers, his grandma. He's doing really well. And he's really stable where he's at.

Blas also testified that the placement was "able to care for [Alex] long term," was able to meet "all [Alex's] short and long-term needs," and was "willing to adopt him," which was the Department's plan for Alex. Additionally, in her final report to the court, Blas stated,

> [Alex] is doing well in his placement. He appears to be a happy 10-month-old baby boy. He loves to be held, cuddled, and loved on by his caregivers. [Alex] is rolling over, scooting, crawling, and attempting to furniture walk. He is eating well and sleeps through the night.

Blas concluded in the report, "[Alex's] placement is willing and able to meet all of [Alex's] needs and is willing to adopt [Alex]."

---

[2] In contrast to Blas's testimony, her final report indicates that Mother's last drug test was on June 27, 2024, when she tested negative, and that Mother tested both positive and negative for drugs in April 2024.

At the close of evidence, the guardian ad litem reported to the court:

Your Honor, [Alex] is doing fabulously in the foster placement. They are absolutely willing to adopt him. They have indicated that they are willing to maintain biological contact, if it is appropriate. So if Mom does get clean and can prove that she is clean, they would be willing to possibly send her pictures, videos[, things] of that nature.

It is a great foster home. He's doing well. He's thriving. And the guardian ad litem would recommend termination, and freeing him up for adoption by the current foster placement.

During closing arguments, Mother's attorney did not provide any argument as to why Mother's parental rights should not be terminated but stated only that "[m]y client would stipulate to the ground O at this time." After hearing that statement and arguments from Father's attorney, the Department, and the child's attorney ad litem, who agreed with the Department's recommendation of termination of Mother's and Father's parental rights, the district court stated that it was taking the matter under advisement.

The district court later announced that it was ordering the termination of Mother's and Father's parental rights. However, before the district court made a written order to that effect, the Department filed a "motion to set aside final orders." In the motion, the Department stated the following:

Prior to the start of the hearing Petitioner, Respondent Mother, and the Attorney Ad Litem for the child entered into an agreement that Petitioner would only seek termination on the grounds that the mother failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the Child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the Child's removal from the parent under Chapter 262 for the abuse or neglect of the Child.

7

Based on this agreement, Petitioner only presented evidence in its case to establish[] termination only on that ground as agreed. Petitioner believes based on recent filings from Respondent Mother, that Respondent Mother entered into the agreement in bad faith with the intent to persuade Petitioner [to] not [pursue] termination on the other available grounds.

Petitioner requests the court to set aside the prior order only granting the termination on the agreed grounds, and set a new final hearing, where all available evidence can be presented.

The district court denied the Department's motion.

In its written order, the district court found by clear and convincing evidence that Mother had failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of Alex and that termination of her parental rights was in Alex's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(O), (b)(2). Based on those findings, the district court terminated Mother's parental rights. The district court terminated Father's parental rights based on the same findings. The district court appointed the Department as managing conservator of Alex and ordered that the Department had permission to move forward with the adoption of Alex by the current foster placement. This appeal by Mother followed.

**STANDARD OF REVIEW**

"Section 161.001 of the Texas Family Code requires two findings to support termination of a parent's legal rights: (1) the parent's acts or omissions must satisfy an enumerated statutory ground for termination; and (2) termination must be in the children's best interest." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 697 (Tex. App.—Austin 2019, pet. denied). "Proceedings to terminate the parent-child relationship

8

implicate rights of constitutional magnitude that qualify for heightened judicial protection." *In re A.C.*, 560 S.W.3d 624, 626 (Tex. 2018). Parental rights have been characterized as "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (citing *Stanley v. Illinois*, 405 U.S. 645, 651 (1972)). They are "perhaps the oldest of the fundamental liberty interests" protected by the United States Constitution. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *E.E. v. Texas Dep't of Fam. & Protective Servs.*, 598 S.W.3d 389, 396 (Tex. App.—Austin 2020, no pet.). "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky v. Kramer*, 455 U.S. 745, 759 (1982). "Consequently, termination proceedings should be strictly scrutinized, and involuntary termination statutes are strictly construed in favor of the parent." *Holick*, 685 S.W.2d at 20. "Because termination of parental rights 'is complete, final, irrevocable and divests for all time' the natural and legal rights between parent and child," a trial court "cannot involuntarily sever that relationship absent evidence sufficient to 'produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established.'" *A.C.*, 560 S.W.3d at 630 (quoting Tex. Fam. Code § 101.007; *Holick*, 685 S.W.2d at 20). "This heightened proof standard carries the weight and gravity due process requires to protect the fundamental rights at stake." *Id.*

"A correspondingly searching standard of appellate review is an essential procedural adjunct." *Id.* "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *Id.* "Evidence is legally sufficient if, viewing all the evidence in the light most favorable to the fact-finding and considering undisputed contrary evidence, a reasonable factfinder could form a firm belief or conviction that the finding was true." *Id.* at 631. "Factual sufficiency, in comparison, requires

weighing disputed evidence contrary to the finding against all the evidence favoring the finding." *Id.* "In a factual-sufficiency review, the appellate court must consider whether disputed evidence is such that a reasonable factfinder could not have resolved it in favor of the finding." *Id.* "Evidence is factually insufficient if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.*

However, "an appellate court's review must not be so rigorous that the only fact findings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.*

**DISCUSSION**

**Compliance with Family Service Plan**

In the first part of Mother's first issue, she asserts that the evidence is insufficient to support the district court's finding that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of Alex. Specifically, Mother argues that she "substantially complied with some provisions of her Family Service Plan," that "other provisions lacked specificity," and that she was unable to comply with some requirements "due to no fault of her own." She further contends that trial counsel's stipulation at the end of trial regarding her failure to comply with the service plan was insufficient to support the district court's finding.

10

"[N]early all [statutory grounds for termination] require proof that the parent has abandoned or endangered the child or that the parent has engaged in specified criminal conduct." *In re R.J.G.*, 681 S.W.3d 370, 373 (Tex. 2023). "The exception is (O)," which "permits termination if a parent fails to comply with a family service plan, which, in lay terms, is a list of tasks the Department requires—and the trial court orders—the parent to perform to obtain the return of a child following removal." *Id.*

There are limitations on the extent to which a trial court may rely on (O) to support the termination of parental rights. "To begin, the statutory text permits termination only if the provision with which the parent failed to comply was 'specifically established' in the written court-ordered service plan." *Id.* "The predicate ground for termination under (O) cannot be proven by clear and convincing evidence if premised on a plan requirement that is unwritten, and thus supplied only by the caseworker's oral testimony, or on one that is written but vague." *Id.* "[A]s its text expressly indicates, '[s]ubsection (O) contemplates direct, specifically required actions.'" *Id.* at 378 (quoting *In re A.L.R.*, 646 S.W.3d 833, 837 (Tex. 2022)). A parent's rights may not be terminated based on "vague plan requirements." *Id.* Rather, "the court's order describing the parent's necessary actions 'must be sufficiently specific to warrant termination of parental rights for failure to comply with it.'" *Id.* (quoting *In re N.G.*, 577 S.W.3d 230, 238 (Tex. 2019)).

"Moreover, even if the Department proves by clear and convincing evidence that a parent failed to comply with a requirement 'specifically established' in the written plan, that requirement may be so trivial and immaterial, considering the totality of what the plan requires, that the parent's noncompliance does not justify termination." *Id.* at 373. "[T]ermination is not automatic or required" under (O), *id.* at 379, and "[a] trial court should not reflexively order

11

termination when the evidence demonstrates noncompliance with a plan requirement," *id*. at 373. "Instead, the trial court should consider whether the nature and degree of the asserted noncompliance justifies termination under the totality of the circumstances." *Id*. at 373-74. "[I]t is the violation of 'material' requirements of a plan that justify termination under (O)." *Id*. at 379. "Thus, if the noncompliance is trivial or immaterial in light of the plan's requirements overall, termination under (O) is not appropriate." *Id*.

On the other hand, "parents cannot overcome the complete failure to comply with a material requirement by arguing that performing other requirements constitutes substantial compliance with the plan overall." *Id*. at 382. "There may be provisions in particular service plans for which nothing less than strict compliance will suffice to avoid termination." *Id*. "Easy examples are provisions that require a parent suffering from drug addiction to complete a drug treatment program or require a parent just released from prison to refrain from re-offending." *Id*. "Even a single or slight violation of these or other material service plan provisions *could* justify termination." *Id*. "But other requirements—particularly those that are bureaucratic or technical—may be too trivial, in the larger context of the plan and the parent's overall performance, to have their breach give rise to termination." *Id*.

"In sum, not all service plan requirements are created equal, and strict compliance with every aspect of every plan requirement is not always the standard." *Id*. "In evaluating whether termination is warranted, the trial court must ensure that any asserted noncompliance is of a requirement that is neither unwritten nor vague but rather 'specifically established' in a court-ordered plan." *Id*. at 383. "Additionally, to justify termination, the noncompliance must not be trivial or immaterial in light of the nature and degree of the parent's compliance and the totality of the plan's requirements." *Id*.

12

In this case, Mother's service plan listed the following concerns identified by the Department:

The Department is worried that [Mother] engaged in illicit substance use, methamphetamine, while she was pregnant with [Alex].

The Department is worried that if [Mother] continues to use methamphetamines while being the sole caregiver to [Alex], this would place [Alex] in a situation that is well above his maturity or ability to provide care for himself.

The Department is worried that [Mother] does not have a stable housing environment that would provide safety for [Alex]. Without a stable living environment this would continue to place [Alex] in a situation that above his maturity and age level with the ability to care for himself.

The Department is worried that [Mother] is not caring for her mental health. [Mother] informed the Department that she did not take any medication and is not in any counseling services.

Based on these concerns, the service plan identified the following goals for Mother:

[Mother] will work with the Department throughout the duration of the case to demonstrate the ability to remain abstinent from illicit substances. [Mother] will ensure that she is remaining free of illicit substances and is no longer under the influence.

[Mother] will work with the Department to ensure the safety of the home and the appropriateness for [Alex's] safety. [Mother] will ensure the home is free and clear of any and all debris on the floor, counters, and sleeping arrangements for [Alex].

[Mother] will work with a therapist and show knowledge of coping skills to use regarding her mental health episodes related to the illicit substance use and any diagnoses. [Mother] will ensure that she can and is able to become a safe and appropriate caregiver to [Alex] by utilizing the skills she is taught.

13

To accomplish these goals, the service plan included the following "required actions" for Mother to complete:

[Mother] will provide and maintain a safe, clean, and appropriate home. She will ensure that the home is free of any health hazards throughout the case. She will allow for announced or unannounced home visits by the Department.

[Mother] will submit to random drug tests on weekly basis. [Mother] is assigned the drug testing color of ORANGE and is required to call the drug testing number of 254-501-4235 Monday through Friday after 8:30AM to determine whether she is required to drug test that day by 3:00PM. Drug tests are not limited to urine test[s]; they may include hair strands, nail testing and mouth swabs. Drug tests can be requested at any time by the Department. If [Mother] comes to a visit under the influence, the visit will stop immediately. The Department has the discretion to change [Mother's] color to increase or decrease the number of tests required.

[Mother] will participate in a self-reporting drug and alcohol assessment to address any substance abuse concerns. [Mother] will comply with all recommendations listed on the drug and alcohol assessment including but not limited to NA/AA, inpatient treatment or intensive outpatient treatment. [Mother] will sign a release of information so the caseworker can check on progress in treatment. If [Mother] has health insurance she will refer to her health insurance provider for screening, assessment, and treatment options.

[Mother] will attend and actively participate in Individual Counseling and a psychosocial exam. She will address the concerns of the Department and demonstrate behavioral changes related to the safety and well-being of [Alex]. The Department will contract and pay for this service if [Mother] is complying. If [Mother] is using a private provider she will sign a release of information or provide any related documentation.

[Mother] will participate in a psychological evaluation to address any mental health needs, parenting ability, and level of functioning. [Mother] will comply with all recommendations listed on the psychological evaluation to include but not limited to: individual counseling, parenting classes, substance abuse treatment and a psychiatric evaluation. The Department will contract and pay for this service if [Mother] is complying. If [Mother] is using a private provider she will sign a release of information or provide any related documentation.

14

We address the evidence pertaining to each of these requirements below.

### *Safe, clean, and appropriate home*

The plan required Mother to "provide and maintain a safe, clean, and appropriate home" and "allow for announced or unannounced home visits by the Department." Mother argues that this requirement is not sufficiently specific because it did not "expressly indicat[e] the name of any new caseworker or the conservatorship supervisor that might make any announced or unannounced visits to her home" or define the term "appropriate." Although we disagree that a service plan must identify the specific caseworker or supervisor who would conduct home visits, we agree that the term "appropriate" is not sufficiently specific in this plan. Given the circumstances under which Alex was removed from Mother's care, it appears likely that the Department's objective with this requirement was for Mother to provide Alex with a home free of illegal substances and illegal drug use. However, the Department did not expressly include that objective in the requirement. Moreover, the record contains insufficient evidence regarding Mother's home. Although Blas answered "no" when asked if Mother was able to provide a safe and stable home for the child, she did not elaborate or provide any details on the conditions of Mother's home environment. The final report was similarly lacking in detail, indicating that Mother's "current home environment is unknown to the Department," that she "allowed for a home visit in November 2024 where she stated that she does not permanently reside with [Father]," and that she "reported that she is in between homes and is currently residing with [Father] temporarily and doesn't know for how long."

15

*Substance abuse and treatment*

The plan also required Mother to drug test on a weekly basis, complete a drug-and-alcohol assessment to address any substance abuse concerns, and comply with all recommendations listed on the assessment including intensive outpatient treatment. Mother argues that the drug-testing requirement was not sufficiently specific because it did not "expressly indicat[e] that if she failed or refused to drug test on her color day, it would be considered as testing positive." However, the drug-testing requirement provided that Mother must "submit to random drug tests on [a] weekly basis," summarized the testing procedures, and explained that drug tests "are not limited to urine test[s]; they may include hair strands, nail testing and mouth swabs." The requirement also specified that "[d]rug tests can be requested at any time by the Department," that "[i]f [Mother] comes to a visit under the influence, the visit will stop immediately," and that "[t]he Department has the discretion to change [Mother's] color to increase or decrease the number of tests required." We conclude that this requirement is sufficiently specific. Although the requirement does not specify the consequences of a missed test, this does not negate the clarity of the requirement that Mother test on a weekly basis, and the evidence is undisputed that Mother failed to do so at any point after June 27, 2024, and seldom did so before that time.

Mother did complete the drug-and-alcohol assessment as required, but she failed to either engage in the recommended inpatient treatment program or complete outpatient treatment. Mother argues that this requirement was not sufficiently specific because it "did not require her to achieve any particular benchmark" regarding treatment or explain why she needed additional treatment when she was already participating in AA/NA. However, the requirement specified that Mother must "comply with *all* recommendations listed on the drug and alcohol

16

assessment including but not limited to NA/AA, inpatient treatment or intensive outpatient treatment." (Emphasis added.) By not following the recommendations of the assessment, Mother failed to comply with this provision of her service plan.

### *Individual counseling and psychological evaluation*

The plan further required Mother to "attend and actively participate in individual counseling" and to "participate in a psychological evaluation to address any mental health needs, parenting ability, and level of functioning." The plan gave Mother the option to complete these requirements with either a Department-recommended provider or a private provider, but if Mother chose to use a private provider, she was required to "sign a release of information or provide any related documentation."

Mother did not comply with these requirements. Regarding individual counseling, the final report indicated that Mother was discharged from the Department-recommended counseling center "due to missing appointments." Blas testified that after that, Mother received individual therapy "with a private provider" but that the Department did not receive any records from this private provider, "only email correspondence where . . . [Mother's] therapist stated that she was unsuccessfully discharged due to not showing up and lack of participation." Blas confirmed through this correspondence that Mother had seen a therapist, but the therapist informed Blas that Mother "is no longer a client, because she wasn't actively attending." Moreover, this therapist could not inform Blas as to how long or how many sessions Mother had attended because Mother "didn't sign a release of information." Similarly, regarding the psychological evaluation, the final report stated that Mother was initially referred to a Department-recommended psychologist, that Mother "did not complete her psychological

17

evaluation" with that provider but wanted to complete it with a private provider, and that the Department had requested a release of information if the report was completed by any provider but that "[n]o report or information has been received at this time."

Mother argues that the individual-counseling requirement was not sufficiently specific because "it did not require her to achieve any particular benchmark." However, this provision specifically required Mother to "attend and actively participate in individual counseling," and the record reflects that she was discharged from one provider for missing appointments and discharged from another for "not showing up and lack of participation." Additionally, the extent of Mother's participation in therapy with the private provider could not be determined due to Mother's failure to sign a release of information as required by the plan.[3]

Mother also argues that because she attempted to complete the psychological evaluation with a private provider, she made a good-faith effort to comply with this requirement but was unable to comply "through no fault of her own." *See* Tex. Fam. Code § 161.001(d) (providing that court may not order termination under Subsection (O) based on parent's failure to comply with specific provision of court order if parent proves by preponderance of evidence that: "(1) the parent was unable to comply with specific provisions of the court order"; and "(2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent"). Section 161.001(d) is an affirmative defense to termination of parental rights under subsection (O) that must be proven by the parent at trial by a preponderance of the evidence. *See id.*; *In re L.E.R.*, 650 S.W.3d 771, 787-88 (Tex. App.—

---

[3] Mother contends that her failure to provide a release of information "was too trivial or immaterial, in light of the degree of her compliance with the plan's material requirements, and the totality of the circumstances, to support termination." In this case, however, it was not trivial because Mother's failure to sign the release prevented the Department (and the court) from determining the extent of Mother's compliance with the individual-counseling requirement.

18

Houston [14th Dist.] 2022, no pet.). Mother failed to meet that burden of proof here. She provided no evidence at trial of the efforts she made to complete the psychological evaluation through a private provider. Additionally, the report indicated that although Mother informed the Department that she would "choose a private provider" for the evaluation, the Department "requested that a release of information be signed to receive the report if completed," but "[n]o report or information ha[d] been received" at the time of the December 2024 report.

In sum, Mother complied with some service-plan requirements in this case, including some drug testing and the completion of a drug-and-alcohol assessment. Additionally, the requirement that Mother "provide and maintain a safe, clean, and appropriate home" was not sufficiently specific in this case, and there was insufficient evidence in the record showing that Mother violated that requirement. On the other hand, Mother failed to take most of the requested drug tests, failed to follow the recommendations of her drug-and-alcohol assessment, failed to complete a psychological evaluation, and failed to attend and actively participate in individual counseling. The district court could have reasonably found that these were material violations of Mother's service plan, especially as they related to Mother's drug use, which was one of the Department's primary concerns in the case. *See In re J.A.G.*, No. 04-24-00511-CV, 2025 WL 99616, at *9-10 (Tex. App.—San Antonio Jan. 15, 2025, pet. denied) (mem. op.) (concluding that violation of subsection (O) was supported by legally and factually sufficient evidence when, despite parent's compliance with other aspects of her service plan, evidence showed "a wide departure from the service plan's drug-testing and -abstinence requirements, which were material to the plan"); *In re Z.R.E.B.*, No. 11-23-00233-CV, 2024 WL 968965, at *4 (Tex. App.—Eastland Mar. 7, 2024, no pet.) (mem. op.) ("Drug and alcohol restrictions are material service plan requirements[.]"); *In re A.P.*, No. 13-19-00342-CV, 2019 WL 6315429, at

19

*7 (Tex. App.—Corpus Christi-Edinburg Nov. 26, 2019, no pet.) (mem. op.) (concluding that parent "failed to comply with numerous, material provisions of the service plan," including failing to submit to drug tests for several months, testing positive for drugs on three occasions, and using drugs two weeks before trial).

Viewing the totality of the above evidence in the light most favorable to the district court's finding, we conclude that a reasonable factfinder could form a firm belief or conviction that Mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the child and that her noncompliance was neither trivial nor immaterial in light of the plan's requirements overall. Accordingly, the evidence is legally sufficient to support the finding. Moreover, when we consider the evidence contrary to the district court's finding, summarized above, we are unable to say that this evidence is "so significant that the factfinder could not have formed a firm belief or conviction" that Mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain Alex's return. Accordingly, the evidence is factually sufficient to support the finding.

Because we conclude that the evidence presented at trial is legally and factually sufficient to support the district court's finding that Mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of Alex, we need not address the effect of the stipulation made by Mother's trial counsel regarding subsection (O). *See* Tex. R. App. P. 47.1.

We overrule the first part of Mother's first issue.

20

**Best interest**

In the second part of Mother's first issue, she asserts that the evidence is insufficient to support the district court's finding that termination of her parental rights was in Alex's best interest. She claims that the only evidence of Alex's best interest was Blas's testimony that Alex "has been with his caregiver since he was pretty much born," that he was "11 months old, and he's known nothing but love from this family," that he is "permanently attached to his foster parents, to his brothers, his grandma," and that he is "doing really well" and is "really stable where he's at."

We review a factfinder's best-interest finding in light of the non-exhaustive list of considerations set out in *Holley v. Adams*, which include the child's wishes, the child's emotional and physical needs now and in the future, emotional or physical danger to the child now and in the future, the parenting abilities of the parties seeking custody, programs available to help those parties, plans for the child by the parties seeking custody, the stability of the proposed placement, the parent's acts or omissions indicating that the parent-child relationship is improper, and any excuses for the parent's conduct. 544 S.W.2d 367, 371–72 (Tex. 1976); *see A.C.*, 560 S.W.3d at 631; *In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012); *C.H.*, 89 S.W.3d at 27. The *Holley* factors are not exhaustive, not all factors must be proved, and a lack of evidence about some of the factors does not "preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *C.H.*, 89 S.W.3d at 27. "We must consider 'the totality of the circumstances in light of the *Holley* factors' to determine whether sufficient evidence supports" the best-interest finding. *In re J.M.G.*, 608 S.W.3d 51, 54 (Tex. App.—San Antonio 2020, pet. denied) (quoting *In re B.F.*,

No. 02-07-00334-CV, 2008 WL 902790, at *11 (Tex. App.—Fort Worth Apr. 3, 2008, no pet.) (mem. op.)).

In this case, the evidence supporting the best-interest finding included the following:

- Mother tested positive for amphetamines upon giving birth to Alex, who also tested positive for amphetamines and showed signs of withdrawal, specifically "not eating as much and shaking." Mother "admitted she used methamphetamine almost every day throughout her pregnancy," including the "Saturday or Sunday before giving birth," and "stated she wanted to stop using but she was just being selfish." This evidence would support a finding that Mother endangered Alex by using amphetamines while she was pregnant with him.

- Mother did not take most of the requested drug tests during the case, which were presumed positive. These included two requested tests in February 2024, four requested tests in March 2024, two requested tests in April 2024, four requested tests in May 2024, and four requested tests in June 2024. Although Mother tested negative on June 27, 2024, she took no drug tests after that, missing four or five requested tests each month between July and November 2024. Additionally, Mother tested positive for drugs on multiple drug tests in April 2024. This evidence would support a finding that Mother was continuing to use drugs while the case was ongoing and thus would continue to use drugs if Alex were returned to her.

- Mother told the Department that she used methamphetamine with Father and that she was living with Father until a week before giving birth to Alex. Although Mother told the Department that "she did not have plans to return to his home," she continued to live with Father on and off while the case was ongoing. Additionally, Mother told the Department that "she was planning to move to Abilene with the baby after being released from the hospital but decided to stay in Harker Heights with a friend," who was "said to have used methamphetamine as well." This evidence would support a finding that Mother might continue to live with drug users if Alex were returned to her, which could continue to endanger Alex.

- The final report indicated that Mother's "current home environment is unknown to the Department" and "that she is in between homes and is currently residing with [Father] temporarily and doesn't know for how long." This evidence would support a finding that Mother's living situation was unstable and uncertain.

- Mother failed to complete various provisions of her family service plan, as discussed above. This evidence would support a finding that Mother was not willing to take the actions necessary to obtain Alex's return.

22

- According to the final report, Mother has not participated in supervised visitation with Alex since June 2024, and when she showed up for scheduled visits on April 18 and 25, 2024, Mother tested positive for both amphetamines and methamphetamine.

- The report also indicated that the Department attempted to schedule virtual visits with Mother but that there were several visits where she "did not show up." During the visits that she did attend "there was minimal involvement," and Mother "would also go on and off camera during the visits."

- During a hearing in July 2024, the court ordered Mother to "complete a segmented hair test, three clean UA[s], and be participating in some of her services in order for visitation to continue." According to the report, Mother "has not completed any of the orders that were given to her during the [July] hearing."

- The Department caseworker testified that Alex "has been with his caregiver since he was pretty much born—since he was a newborn," that "he's known nothing but love from this family," that he's "permanently attached to his foster parents, to his brothers, his grandma," that "[h]e's doing really well," and that "he's really stable where he's at." The caseworker also testified that the placement was "able to care for [Alex] long term," was able to meet "all [Alex's] short and long-term needs," and was "willing to adopt him."

- The caseworker elaborated in her final report to the court that Alex "is doing well in his placement," "appears to be a happy 10-month-old baby boy" who "loves to be held, cuddled, and loved on by his caregivers, that he "is rolling over, scooting, crawling, and attempting to furniture walk, and that he "is eating well and sleeps through the night." The caseworker concluded in the report, "[Alex's] placement is willing and able to meet all of [Alex's] needs and is willing to adopt [Alex]."

- The guardian ad litem similarly opined that Alex was "doing fabulously in the foster placement," that "[t]hey are absolutely willing to adopt him," and that "[t]hey have indicated that they are willing to maintain biological contact" with Mother if she "does get clean and can prove that she is clean."[4]

The evidence contrary to the best-interest finding was sparse, but included the following:

- Mother reported to the Department that she is employed full time (although she failed to provide proof of income).

- Mother tested negative for drugs in April and June 2024.

---

[4] Mother did not object to the district court's consideration of the guardian ad litem's statement. *See Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997) (explaining that unsworn statements can be considered evidence if opposing party fails to object to them).

23

- Mother partially complied with her service plan, including by completing some drug tests, completing her drug-and-alcohol assessment, and participating in individual therapy with a private provider (although because she failed to sign a release of information, her progress in therapy could not be determined).

Viewing the totality of the evidence in the light most favorable to the finding, we conclude that a reasonable factfinder could form a firm belief or conviction that terminating Mother's parental rights was in the best interest of Alex. Accordingly, the evidence is legally sufficient to support the finding. Additionally, on this record, we cannot conclude that the disputed evidence contrary to the best-interest finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true. Accordingly, the evidence is factually sufficient to support the best-interest finding.

We overrule the second part of Mother's first issue.

**Conservatorship**

In Mother's second issue, she asserts that because the evidence was insufficient to support the termination of her parental rights, the district court abused its discretion in appointing the Department as Alex's managing conservator. Because we have concluded that the evidence is sufficient to support termination, we overrule Mother's second issue. *See In re D.N.C.*, 252 S.W.3d 317, 319 (Tex. 2008) (per curiam) (explaining that when Department's conservatorship appointment is based solely on termination of parental rights, parent's "challenge to the conservatorship appointment was subsumed in her appeal of the parental-rights termination order").

**CONCLUSION**

We affirm the district court's decree of termination.

_____

Gisela D. Triana, Justice

Before Justices Triana, Theofanis, and Crump

Affirmed

Filed:   July 24, 2025

25